PACIFIC FRUIT EXPRESS COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1274–71. Filed July 30, 1973.

*Robert J. Casey, Thomas E. Tyre,* and *Arnold I. Weber,* for the petitioner.

*James Booher* and *Lawrence G. Becker,* for the respondent.

OPINION

SIMPSON, *Judge:* The respondent determined deficiencies of $539,-369.69 for 1964, $346,408.59 for 1965, and $308,353.34 for 1966 in the Federal income tax of the petitioner. The issues in this case have been severed, and the only issue to be decided herein is whether the petitioner, which adopted a class life for computing its depreciation deduction in accordance with Rev. Proc. 62–21, 1962–2 C.B. 418, as amended by Rev. Proc. 65–13, 1965–1 C.B. 759, and met the reserve ratio test set forth therein, without regard to the transition rules therein provided, can be denied a deduction under section 162, I. R. C. 1954,[1] for expenditures for the repair of some of its railroad cars on the ground that the expenditures extended the useful life of such cars.

All of the facts have been stipulated, and those facts are so found.

The petitioner, Pacific Fruit Express Co., is a corporation organized under the laws of the State of Utah with its principal office in San Francisco, Calif. The Union Pacific and Southern Pacific Railroads have owned the petitioner's outstanding stock since 1906, when the petitioner was organized. During the years 1964 through 1966, the petitioner's business included owning, leasing, and operating approximately 20,000 refrigerated railroad cars.

Prior to 1954, the petitioner recorded the initial cost of the railroad cars which it acquired in a straight-line group account. In 1954, the petitioner established a sum-of-the-years-digits group account, and recorded in such account the initial cost of the railroad cars which it

---

[1] All statutory references are to the Internal Revenue Code of 1954.

acquired from 1954 through 1964. Pursuant to Rev. Proc. 65–13, the petitioner established a double-declining-balance group account, and recorded in that account the initial cost of the railroad cars which it acquired after 1964.

In 1962, the petitioner decided to utilize the depreciation guidelines promulgated in Rev. Proc. 62–21 and adopted a 15-year class life for the purposes of depreciating its refrigerated railroad cars, as compared to the 25-year useful life which it had used for such purposes immediately prior to 1962. It used such 15-year class life in 1964 and 1965. During such years, the petitioner met the reserve ratio test of such revenue procedure, as amended by Rev. Proc. 65–13, without resort to the transition rules therein provided, and the respondent has not proposed any changes in the useful lives being used by the petitioner for purposes of its depreciation deduction.

During 1964 and 1965, the petitioner classified amounts which it expended for maintenance or repair of its cars into four categories. Amounts expended for inspection, cleaning, servicing, and other minor expenditures were classified as "light running maintenance" if the work to the car could be completed in a day. Amounts expended for work which required 1 to 3 days for completion and up to 30 man-hours of labor were classified as "heavy running maintenance," and the amounts expended for work which required more than 3 days for completion and more than 30 man-hours of labor were classified as "heavy repairs." Expenditures to a series of cars, which were usually budgeted and which were approved by management, were classified as "program repairs."

On its corporate Federal income tax returns for 1964 and 1965, the petitioner claimed deductions for the expenditures for maintenance or repair of its cars. The respondent determined that the amounts of $1,512,654.30 for 1964 and $1,427,268.88 for 1965 represented expenditures for the repair of cars 15 years old or older as of January 1, 1964, and that such expenditures were capital in nature. For the purposes of deciding this issue, such expenditures may be assumed to represent "heavy repairs" and "heavy program repairs." As of January 1, 1964, cars 15 years old or older were included in the petitioner's straight-line group account. The respondent does not contend that the amounts at issue constituted expenditures for additions or betterments to the cars to which they were applied or that such expenditures adapted the cars to a new or different use.

We are asked to decide the effect of the fact that the petitioner computed its deduction for depreciation in accordance with Rev. Proc. 62–21, as amended by Rev. Proc. 65–13. It contends that because it used group accounts in computing its depreciation deduction, the determination of whether an expenditure has extended useful life must be made

on a group rather than an asset-by-asset basis. It further contends that since it met the reserve ratio test of the revenue procedure, it is entitled to deduct all its expenditures for the maintenance or repair of such cars and that no portion of such expenditures must be treated as capital expenditures solely on the ground that they extended the useful life of some of such cars.

The respondent contends that pursuant to section 162 and sections 1.162–4, 1.263(a)–1, and 1.446–1(a)(4)(ii) of the Income Tax Regulations, expenditures which substantially prolong the useful life of an asset are not deductible and that Rev. Proc. 62–21 does not affect the determination of whether such expenditures are deductible.

Section 162 allows a deduction for "the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business," and section 263 generally disallows a deduction for capital expenditures. Since 1921, the regulations under section 162 and its predecessors have continuously provided that:

The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted * * * [Sec. 1.162–4, Income Tax Regs.]

See, e.g., sec. 39.23(a)–4, Regs. 118; sec. 29.23(a)–4, Regs. 111; art. 23(a)–4, Regs. 101, 94, 86; art. 124, Regs. 77, 74; art. 104, Regs. 69, 65; art. 103, Regs. 62, 45. A correlative regulation under section 263 expressly provides that amounts expended "to add to the value, or substantially prolong the useful life, of property owned by the taxpayer" are not deductible. Sec. 1.263(a)–1(b), Income Tax Regs.; see sec. 1.446–1(a)(4)(ii), Income Tax Regs.

A regulation of such long standing as section 1.162–4 is entitled to careful consideration (see *Helvering* v. *Reynolds*, 313 U.S. 428 (1941); *Helvering* v. *Wilshire Oil Co.*, 308 U.S. 90 (1939)), and the courts have uniformly applied its test in determining whether an expenditure constituted a repair or a capital expenditure. *Honigman* v. *Commissioner*, 466 F. 2d 69 (C.A. 6, 1972), affirming on this issue 55 T.C. 1067 (1971); *Mountain Fuel Supply Co.* v. *United States*, 449 F. 2d 816 (C.A. 10, 1971); *United States* v. *Wehrli*, 400 F. 2d 686, 689 (C.A. 10, 1968); *Jones* v. *Commissioner*, 242 F. 2d 616 (C.A. 5, 1957), affirming 24 T.C. 563 (1955); *Chicago, Burlington & Quincy R. Co.* v. *United States*, 455 F. 2d 993 (Ct. Cl. 1972); *Oberman Manufacturing Co.*, 47 T.C. 471 (1967); *Plainfield-Union Water Co.*, 39 T.C. 333 (1962); *Red Star Yeast & Products Co.*, 25 T.C. 321, 349 (1955); *Illinois Merchants Trust Co., Executor*, 4 B.T.A. 103 (1926). Moreover, the test of the regulation is in general accordance with long-established and well-accepted principles of accounting. See, e.g., Accounting Research Study No. 7, Inventory of Generally Accepted Accounting Principles for Business Enterprises 156 (1965); Hills, The Law of Accounting

and Financial Statements, secs. 2.11, 7.6 (1957); Wixon, Accountants' Handbook 16.11 (5th ed. 1970).

Other regulations help to explain how to account for depreciable property. See, e.g., secs. 1.167(a)–7, 1.167(a)–8, Income Tax Regs. Such property may be accounted for by treating each individual asset as an item account or by combining two or more assets in a multiasset account. The parties have treated the multiasset accounts involved in this case as group accounts. In the case of a group account, a class life is determined on the basis of a weighted average of the useful lives of the assets included in the group. During such class life the total depreciation which is taken each year is credited to the depreciation reserve. When a normal retirement occurs, the full cost or other basis of the asset retired, unadjusted for depreciation or salvage, is removed from the asset account and charged to the depreciation reserve, and the amount of salvage is credited to the depreciation reserve. If the retirement was due to a cause not contemplated in establishing the depreciation rate, it is an abnormal retirement, and the full cost or other basis of the asset is removed from the account, and the depreciation reserve is charged with the depreciation applicable to the retired asset. Secs. 1.167(a)–7, 1.167(a)–8, Income Tax Regs.

Rev. Proc. 62–21 set forth procedures that would be followed by the respondent in examining depreciation deductions. It established approximately 75 broad classes of assets, called guideline classes, and a guideline life for each such class, which was based on industry-wide experience as to the useful lives of the assets in each such class. It then provided for the comparison of the lives used by the taxpayer in computing his depreciation deduction with the guideline lives. To facilitate the comparison, the taxpayer was encouraged to regroup his assets according to the guideline classes. Even if the taxpayer did not regroup his assets, the respondent would regroup them solely for the purpose of examining the claimed depreciation deduction. If the comparison demonstrated that the lives used by the taxpayer corresponded to guideline lives, the deduction for depreciation was not to be disturbed unless the taxpayer's retirement and replacement practices were inconsistent with the lives being used by the taxpayer. Such consistency could be demonstrated by meeting the reserve ratio test or by an examination of all the facts and circumstances.

The first step in meeting the reserve ratio test was to compute the taxpayer's reserve ratio for each guideline class. Such ratio was the ratio of the depreciation reserves for the assets in any guideline class to the basis of such assets, generally their cost. The taxpayer's reserve ratio was then compared with the appropriate reserve ratio range which was established for assets of the same class and which took into consideration the method of depreciation used by the taxpayer and the

rate of growth of his depreciation account. Such range included a tolerance which permitted the taxpayer to replace his assets at a rate 20 percent slower than was consistent with the life used, and if the range included the taxpayer's ratio, his depreciation deduction was not disturbed.

As is apparent from its description, Rev. Proc. 62–21 had a limited purpose. It was:

designed to provide taxpayers with a greater degree of certainty in determining the amount of their depreciation deductions and to provide greater uniformity in the audit of these deductions by the Internal Revenue Service. [Rev. Proc. 62–21, 1962–2 C. B. 418, 429.]

To emphasize its limited purpose, the revenue procedure also stated:

where the useful life of an individual asset must be used to determine eligibility for a special method of computing depreciation or for any other provision where eligibility depends on the useful life of the individual asset, such life must be determined for that purpose without regard to this Revenue Procedure. Examples of instances where the useful life of an individual asset must be so determined include (1) section 167(c) where the useful life of an asset must be 3 years or more to qualify for certain accelerated methods of depreciation, and (2) section 179 where the useful life of an asset must be 6 years or more to qualify for the additional first-year depreciation allowance. Moreover, the depreciation deduction claimed for an asset in the taxable year of its disposition may be governed by Revenue Ruling 62–92, C.B. 1962–1, 29. [Rev. Proc. 62–21, supra at 430 fn. 3]

Furthermore, even though a taxpayer used a guideline class life under the revenue procedure, he must, when an asset is retired, make adjustments in the asset account and depreciation reserve based on the cost and the depreciation attributable to the retired asset. Rev. Proc. 62–21, supra at 472, 476–477. This Court has also held that the adoption of a guideline life for depreciation purposes under Rev. Proc. 62–21 does not bind the taxpayer with respect to the useful life which it claims for the purposes of the investment credit. Triangle Publications, Inc., 54 T.C. 138 (1970).

The inapplicability of the revenue procedure to this issue is made most apparent by answer 33 of the explanatory questions and answers which accompanied the issuance of the revenue procedure. That answer stated:

The depreciation reform does not affect the classification of expenditures as capital or expense. Questions in this area must be resolved on the basis of presently established principles. The depreciation reform affects only those expenditures which are properly chargeable to capital and recoverable through depreciation deductions. [Rev. Proc. 62–21, supra at 472.]

Contrary to the petitioner's suggestion, there is nothing to indicate that the answer was concerned only with expenditures which constitute betterments or additions and not with expenditures which substantially prolong the useful life of an asset.

Under all these circumstances, it seems clear to us that the purpose of Rev. Proc. 62–21 was to establish new rules for computing allowable deductions for depreciation. It seems equally clear that if a taxpayer adopted a class life in accordance with that revenue procedure, the use of such class life for depreciation purposes would not affect the applicability of other provisions of the law. There was no intention to change the asset-by-asset test of section 1.162–4 of the regulations for determining whether a repair is a deductible expense or a nondeductible capital expenditure. Indeed, the respondent, pursuant to Rev. Proc. 62–21, could regroup a taxpayer's assets for the purpose of examining the claimed depreciation deduction, even though the taxpayer had chosen to account for his depreciable assets in item accounts. If a taxpayer did use item accounts, it seems clear that an asset-by-asset test would be applied, and there is no reason to apply a different test in this case because the petitioner, rather than the respondent, grouped the assets.

Events subsequent to the issuance of Rev. Proc. 62–21 clearly demonstrate that the grouping of assets for depreciation purposes under that revenue procedure did not change the asset-by-asset test of section 1.162–4 of the regulations. In 1971, the depreciation rules of Rev. Proc. 62–21 were superseded, and Congress enacted the class life asset depreciation range (ADR) system of accounting for depreciable property. Sec. 167(m); sec. 1.167(a)–11, Income Tax Regs. Under the class life ADR system, assets are grouped for purposes of depreciation, but there is no reserve ratio test. If the taxpayer elects the ADR system, he can also elect to use the repair allowance rule, which is designed to provide a simplified procedure for the resolution of factual questions concerning whether a repair expenditure is an ordinary expense or a capital expenditure. Sec. 1.167(a)–11(d)(2)(i)(a), Income Tax Regs. Under the rule, all expenditures for repair, maintenance, rehabilitation, or improvement of "repair allowance property" within an asset guideline class, which are not clearly capital expenditures, are treated as currently deductible repairs to the extent that they do not exceed the repair allowance for the class. However, if a taxpayer does not elect the repair allowance, the determination of whether repair expenditures are deductible or must be capitalized must be based on the usual rule applied asset by asset. Secs. 1.167(a)–11(d)(2)(i)(a), 1.167(a)–11(d)(2)(iv), Income Tax Regs. Thus, under the ADR system, assets may be grouped for depreciation purposes, and if the repair allowance is elected, the deductibility of certain repair expenditures will be determined on a group basis. Yet, it is clear that in the absence of the election, the traditional rule for determining whether a repair expenditure may be deducted or must be capitalized is applied asset by asset, even though the assets may be grouped for depreciation purposes.

The respondent has not extended the useful lives used by the petitioner in determining its depreciation deduction, and the petitioner contends that since its useful lives were not lengthened, no expenditure which it made could have extended the useful life of any of its railroad cars. We must reject the petitioner's contention. When an expenditure is made which appreciably prolongs the life of an asset, it does not necessarily follow that the useful life of the asset is then treated as being equal to the sum of its original life and its prolonged life. Rather, the expenditure may be properly treated as having created a separate depreciable item. Black, Champion & Brown, Accounting in Business Decisions—Theory, Method and Use 349 (3d ed. 1973) ; Wixon, Accountants' Handbook 17.27 (5th ed. 1970) ; see *Mountain Fuel Supply Co.* v. *United States*, 449 F. 2d 816, 819–820 (C.A. 10, 1971) ; *Leedom & Worrall Co.*, 10 B.T.A. 825, 834 (1928) ; cf. *Nelson* v. *Commissioner*, 184 F. 2d 649 (C.A. 8, 1950), affirming a Memorandum Opinion of this Court; *Fire Companies Building Corporation*, 18 B.T.A. 1258 (1930), affd. 57 F. 2d 943 (C.A.D.C. 1932) ; *Commodore's Point Terminal Co.*, 18 B.T.A. 385, 389 (1929). Under such circumstances, it is, therefore, clear that the respondent's failure to extend the petitioner's class life does not prevent him from claiming that certain expenditures appreciably extended the useful life of individual railroad cars.

The petitioner also contends that by meeting the reserve ratio test of Rev. Proc. 62–21, it clearly demonstrated that its replacement and retirement procedures were in accordance with a 15-year class life; and, therefore, the respondent could not require it to capitalize repair expenditures on the ground that they extended the useful life of assets in the group. In the first place, it should be reiterated, in considering this argument, that the purpose of Rev. Proc. 62–21 was to establish new procedures for accounting for depreciation and that the reserve ratio test was merely an objective means of determining whether the depreciation deductions being claimed by a taxpayer were consistent with his replacement policies; it was not intended to deal with the question of whether a repair expenditure may be deducted or must be capitalized. Moreover, the reserve ratio may be affected by many factors. See T.D. Release, June 21, 1971; Low, "Charging Asset Restoration Costs to Reserve Account Can Improve Reserve Ratio Position," 18 J. Tax. 271 (May 1963). Under such circumstances, we find that the meeting of the reserve ratio test is irrelevant in determining whether an expenditure appreciably extended the life of the individual asset to which it was applied.

Much of the argument between the parties in this case has concerned the formula used by the respondent to determine the amount of the repair expenditures made on railroad cars that were nearing the end of their useful lives. The petitioner argues that although the class life

for its railroad cars was 15 years, the class included some cars with useful lives of less than 15 years and some with useful lives in excess of 15 years. It asserts that the respondent sought to require capitalization of the repair expenditures on all cars of 15 years, even though those cars may have had a useful life in excess of 15 years that was taken into consideration in arriving at the average class life of 15 years. In deciding the issue as stipulated by the parties, we do not reach the question of whether the respondent properly computed the amount of repair expenditures which substantially extended the useful life of some of the railroad cars. Although we are deciding the stipulated issue in favor of the respondent, we are not thereby approving of the formula used by him, and we express no opinion on that question at this time. Similarly, we are also expressing no opinion on whether either party may use a statistical projection to reflect which repairs, on an asset-by-asset basis, should be capitalized and which should be expensed.

*The parties are directed to move or otherwise act with respect to further proceedings in this case on or before August 31, 1973.*